

**SO ORDERED.**

**SIGNED this 30 day of January, 2009.**

_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE

_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| GARY E. KRAUSE, | ) | Case No. 05-17429 |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| and | ) | |
| | ) | |
| LINDA S. PARKS, Trustee | ) | |
| | ) | |
| Intervener, | ) | |
| v. | ) | Adversary No. 05-5775 |
| | ) | |
| GARY KRAUSE and RICHARD KRAUSE, | ) | |
| | ) | |
| Defendants | ) | |
| and | ) | |
| | ) | |

-1-

**DRAKE KRAUSE and RICK KRAUSE,**       )
                                            )
                    **Intervener.**              )
_____)

## MEMORANDUM OPINION

This matter is before the Court as a result of the chapter 7 trustee's ongoing search for assets of the estate and administration of this estate. On September 19, 2008 the trustee filed a motion for turnover of certain safe deposit boxes and their contents and for sanctions and contempt against debtor-defendant Gary E. Krause and his brother-defendant Richard L. Krause for violating this Court's temporary restraining order entered November 21, 2005, the preliminary injunction entered December 2, 2005, and the order entered April 14, 2006 requiring complete disclosure of assets.[1] On September 25, 2008, the trustee filed a motion to compel surrender of offshore assets and to find debtor-defendant Gary E. Krause in contempt of the Court's April 14, 2006 order requiring disclosure of assets.[2] The trustee's motions were set for hearing on October 9, 2008 at which time the Court heard argument from counsel and the parties and received some evidence on the motions. The Court continued the hearing to December 2, 2008 for further evidence and ordered defendants Krause to make supplemental disclosures.[3]

In the interim, counsel entered appearances for the defendants Krause, whom had previously appeared *pro se,* and sought additional time to complete their supplemental disclosures.[4] On the due

---

[1] Dkt. 567.

[2] Dkt. 571 and 572.

[3] Dkt. 577.

[4] Dkt. 585, 586, 588 and 589.

Case 05-17429    Doc# 223    Filed 01/30/09    Page 2 of 41

date for supplemental disclosures, counsel for Gary filed a notice of assertion of his privilege under the Fifth Amendment to the United States Constitution.[5] The trustee's motions came on for evidentiary hearing on December 2, 2008. The chapter 7 trustee, Linda S. Parks, appeared in person and by counsel James Robinson and Scott Hill. The United States appeared by its counsel Thomas Curteman. Gary E. Krause appeared in person and by his attorney Stephen M. Joseph. Richard L. Krause appeared in person and by his attorneys William H. Zimmerman, Jr. and James R. Pratt. Intervenors Rick and Drake Krause appeared by their attorney Val Wachtel.

I.  History of Proceedings[6]

To understand the context in which the trustee's motions arise, a brief summary of the proceedings leading up to the current motions is necessary. Gary filed his chapter 7 bankruptcy on October 10, 2005.[7] His primary creditor is the Internal Revenue Service to whom he is indebted in excess of $3 million dollars for unpaid federal income taxes and for which federal tax liens have been filed. The United States filed the current adversary proceeding on November 1, 2005 and sought to have Gary's tax debt excepted from discharge under 11 U.S.C. § 523(a)(1)(C) and to declare that certain trusts and entities were holding property as Gary's nominees. The Government obtained an *ex parte* temporary restraining order effectively freezing all assets held by Gary, his

---

[5]  Dkt. 606.

[6]  To fully appreciate the factual background of this case, the reader is commended to several opinions and orders issued by this Court, where the proceedings and facts are more fully described.  *See* Dkt. 66 (Living Expenses Order); Dkt. 80 (Preliminary Injunction and Asset Disclosure Order); Dkt. 128 (Inadequate Disclosures Order); Dkt. 314 (Spoliation/Sanctions Order); Dkt. 533 (Opinion on Trial of Nominee Claims). These opinions and orders emanate from hearings held December 1-2, 2005 (preliminary injunction); January 19, 2006 (living expenses); June 15, 2006 (continued living expenses and adequacy of disclosures); March 22-23 and April 12, 2007 (spoliation/sanctions trial); and November 26-30 and December 3-6, 2007 (nominee claims trial).

[7]  Gary voluntarily commenced this bankruptcy when his efforts to avoid an IRS collection summons were unsuccessful.

companies, or the trusts, pending a determination of the nominee claim.[8]  Following an evidentiary

hearing on December 1 and 2, 2005, the Court entered a preliminary injunction leaving in place the

temporary restraining order, with some modification for the interim use of frozen assets to pay

certain living expenses.[9]

Gary then applied to the Court for allowance of monthly living expenses to be paid with the

frozen assets.[10]   The chapter 7 trustee also sought and was granted the right to intervene in the

adversary wherein she proceeded to also pursue a nominee claim and turnover of estate property.

Both the Government and the trustee opposed Gary's living expense request.  Ultimately, the parties

reached a resolution on most of the living expenses, permitting a monthly allowance from December

2005 through April 2006, but the order and agreement was expressly conditioned upon debtor's

cooperation in identifying assets of the estate and assets of the alleged nominees.[11]  Upon further

consideration of Gary's and Richard's request to pay their attorney's fees from the frozen assets, the

Court ordered Gary and Richard to make a complete, sworn disclosure of every asset owned or

controlled by Gary, the alleged nominee trusts, and any other entities with which they "have a

connection of any kind."[12]  Gary filed his asset disclosures on May 11, 2006.[13]  He also sought to

---

[8]  Dkt. 6.

[9]  Dkt. 12, 17.

[10]  Dkt. 22.

[11]  Dkt. 66.

[12]  Dkt. 80.  This April 14, 2006 order has been referred to from time to time as the "Asset Disclosure
Order."

[13]  Dkt. 98.

-4-

continue the monthly living expense allowance.[14]  An evidentiary hearing was held on June 15, 2006

on the allowance of payment of attorney fees, the continuation of monthly living expenses, and the

adequacy of the asset disclosures.  On August 8, 2006, the Court issued its order regarding the

adequacy of the asset disclosures, finding omissions from Gary's disclosures (including a safe

deposit box in the name of Drake Enterprises, Inc.) and denying payment of attorney fees from the

frozen assets.[15]

Meanwhile, the Government and the trustee sought discovery from Gary during 2006.  The

discovery was contentious and complicated due in part to Gary's labyrinth of transfers and entities

spanning a period of some 20 years, as well as Gary's recalcitrance.  In the course of that discovery,

there were numerous instances that suggested Gary and his business interests were involved in

dealings with foreign entities and individuals in known tax-haven countries, including Switzerland,

Liberia and Panama.   Ultimately, the Court's intervention in discovery was required and resulted

in an order compelling Gary to turnover his computers to the trustee.  That production led to the

discovery that Gary had installed and was running a software wiping program that permanently

erased or purged files from his computers; the trustee then filed a motion for sanctions for spoliation

of electronic evidence.  Following a trial on the spoliation motion in the spring of 2007, the Court

found that  Gary had indeed destroyed electronic evidence and assessed sanctions against him.[16]

Among the sanctions assessed was an order for Gary to repay the sum of $59,710, the amount

---

[14]  Dkt. 96.  The Court eventually allowed some continued living expenses but those allowances were cut off the end of July 2006.  *See* Dkt. 123.  The trustee subsequently discovered that Gary began receiving an $8,000 monthly "consulting fee" from Omnimedica, a Swiss company.

[15]  Dkt. 128.  Shortly thereafter, counsel for Gary and Richard withdrew their representation and Gary and Richard have proceeded *pro se* since the fall of 2006.

[16]  Dkt.  314, 317.

-5-

transferred by Gary's nominee FIMCO for investment in Live Wire Media, in violation of the preliminary injunction.[17]

Thereafter, the parties completed discovery and the Court entered a final pretrial order. The parties filed cross-motions for summary judgment on the Government's and trustee's adversary claims and motions to dismiss. All of the dispositive motions were denied.

The Government's and trustee's nominee claims proceeded to trial in late November of 2007. After a lengthy trial, this Court took the matter under advisement and issued its decision in April of 2008, granting judgment in favor of the trustee and the Government, determining that the tax debt was excepted from debtor's discharge, and declaring that five Krause Children's Trusts established by Gary were his nominees.[18] The property and assets held by those trusts were therefore determined to be debtor's property, subject to turnover as property of the bankruptcy estate and subject to federal tax liens.

Since that time, the trustee has been gathering the assets and property held by the nominees and administering the estate. As evidenced by the trustee's current motions before the Court, the trustee contends that additional offshore assets or holdings that Gary has not disclosed exist and that Gary and Richard violated the Court's temporary restraining order and preliminary injunction by accessing and changing the ownership on safety deposit boxes maintained at Landmark National Bank, Great Bend, Kansas.

### II. The Current Motions and Evidence

#### A. Turnover of Alleged Undisclosed Offshore Holdings

---

[17] To date, Gary has not complied with the Court's order.

[18] Dkt. 533, 534. That decision is currently on appeal to the U.S. District Court for the District of Kansas.

-6-

The trustee asserts that Gary has offshore interests or holdings that he failed to identify in his asset discloses[19] made in May of 2006 pursuant to the Court's Asset Disclosure Order.[20] At that time, Gary was ordered to "make a complete, sworn disclosure of all assets of any entity with which he has a connection of any kind as promptly as possible and shall, in any event, not obstruct or delay any effort by either the Government or the trustee to investigate his affairs."[21] He was also ordered to advise the Court and parties in writing immediately upon "becoming employed by an entity outside of those owned or controlled by any of the trusts."[22] This latter disclosure was to ensure that Gary repaid any frozen assets used by him during the pendency of the case.[23] In any event, it is crystal clear that the Court wanted to know about Gary's post-petition income and employment.

At the end of the October 9, 2008 hearing on the current trustee motions, the Court ordered Gary and Richard to make supplemental disclosures, finding (again) that the May, 2006 disclosures were inadequate, and continuing the hearing for further evidence.[24] At this point, Gary and Richard

---

[19] Dkt. 98.

[20] Dkt. 80.

[21] Dkt. 80, p. 25.

[22] *Id.*, p. 26.

[23] As set forth in the first order allowing a monthly living allowance from the frozen assets: "In the event that . . . debtor finds employment or receives income from any source, the debtor will refund any money withdrawn from the accounts pursuant to this order." Dkt. 66, p. 7, ¶ 9. And in the order concerning debtor's request to use frozen assets to pay his attorney, the Court stated: "If, at the conclusion of this adversary proceeding, the Court determines that the property of the GKT [Gary Krause Trust] is in fact Gary's property and is legally encumbered by the Government's liens, Gary will be required to repay any and all withdrawals authorized under this Order to the Government or the estate, as their interests shall appear, as a condition to his receiving a discharge in this case." Dkt. 80, p. 26.

[24] Dkt. 577. The Court previously found Gary's asset disclosures to be incomplete in ruling on his request to continue a monthly living expense allowance and his request to use frozen assets for payment of his attorney fees. *See* Dkt. 123, p. 9-10, 17-18 (describing omissions in May disclosures); Dkt. 128, p. 7-15.

retained counsel to represent them.[25]  Richard filed his supplemental disclosures averring that no additional assets were held by the Krause Children's Trusts or the Gary E. Krause Trust.[26]  Gary filed his response to the order for supplemental disclosures, but asserted his privilege against self-incrimination under the Fifth Amendment.[27]  Counsel for Gary and Richard have represented that their clients are, or may be, the subject of a criminal investigation and no party has challenged that assertion.  Gary subsequently made limited supplemental disclosures, identifying domestic business dealings and sources of income since his bankruptcy filing.[28]  With the case in this posture, the trustee's motions came on for evidentiary hearing.

The evidence presented at the December 2 hearing focused on two discrete foreign connections: (1) Gary's post-petition consulting agreement with Swiss pharmaceutical company Omnimedica (Dr. Hans E. Holzgang) and/or Novelpharm A.G. from which he derived monthly income of $8,000; and (2) Gary's pre-petition dealings with foreign trusts and entities, primarily Overseas Trust Company (Urs Trepp), ASI (Esther Iseppi), Brayford Investment Ltd and Urs Kaelin. As to the first, Gary testified freely concerning his connection to Omnimedica/Novelpharm A.G. and disclosed this connection in supplemental disclosures filed with the Court.  As to the second area, Gary asserted the Fifth Amendment privilege when questioned about these connections and relationships.  The Court addresses each of these in order.

1.    Omnimedica/Novelpharm Connection

---

[25]  Dkt. 585 and 588.

[26]  Dkt. 602.

[27]  Dkt. 606.

[28]  Dkt. 612 and 622.

-8-

Early in this case, Gary testified that he has been involved in an anti-aging project for some twenty years. In 2005, prior to filing his bankruptcy case, Gary's work on an anti-aging project with Omnimedica began. In late March 2005, Gary met Dr. Hans Holzgang of Omnimedica, which Gary identified as a Swiss pharmaceutical firm, and began his involvement with Omnimedica.[29] Gary described an entity called Novelpharm, A.G., a foreign business entity, as an affiliate of Omnimedica. Omnimedica manufactures products, including food products with its $OM_{24}$ compound invented by Holzgang. Novelpharm deals with the pharmaceutical applications of $OM_{24}$. In late September of 2006, Gary entered into a nine month consulting agreement with Novelpharm whereby he was to be paid a consulting fee of $8,000 per month.[30] Under the agreement, Gary was hired to assist Novelpharm in marketing its product line and raising additional capital. According to Gary, his consulting agreement expired March 31, 2008, although no written extension of the agreement has been produced. The documents produced by Gary evidencing payment of the consulting fee reflect no payments for the initial term of the agreement[31] and include payments after March 31, 2008:

| Date | Amount | Check no. |
|------|--------|-----------|
| 09-05-07 | $4,000 | 7894326 |
| 09-05-07 | $4,000 | 7894327 |
| 10-25-07 | $8,000 | 7917386 |

---

[29] Dkt. 605, 10/9/08 Tr., pp. 24-25.

[30] This consulting agreement was produced with Gary's supplemental disclosures shortly before the evidentiary hearing on December 2. Dkt. 612 and 622. Dr. Holzgang executed the agreement on behalf of Novelpharm. The term of the consulting agreement was October 1, 2006 to June 30, 2007, subject to being extended in writing by mutual agreement of the parties. The documents indicate that Omnimedica, not Novelpharm, paid the consulting fee.

[31] The Court is aware of at least one $8,000 payment made November 2, 2006 per Exhibit 64 admitted into evidence at the spoliation/sanctions trial.

-9-

| | | |
|---|---|---|
| 11-27-07 | $8,000 | 7918779 |
| 12-21-07 | $8,000 | 7920015 |
| 01-25-08 | $8,000 | 7921245 |
| 03-04-08 | $4,000 | 7922716 |
| 03-04-08 | $4,000 | 7922717 |
| 04-04-08 | $4,000 | 7924020 |
| 04-04-08 | $4,000 | 7924021 |
| 04-24-08 | $4,000 | 7924866 |
| 04-24-08 | $4,000 | 7924867 |
| 07-11-08 | $4,000 | 7928160 |
| <u>07-11-08</u> | <u>$4,000</u> | <u>7928161</u> |
| Total | $72,000 | |

At the December 2 hearing, Gary testified that (1) he owned no stock in either Omnimedica or Novelpharm; (2) he held no corporate debt instruments of Omnimedica or Novelpharm; (3) he had no personal investment in projects with Omnimedica or Novelpharm; and (4) he did not know Omnimedica's source of money to pay his consulting fee and expressly denied that either FIMCO or Federal Gasohol (Gary's nominees) was the source of the consulting fee.

In April of 2007, while providing consulting services to Omnimedica, Gary formed a Delaware corporation, CellularRx, using the incorporation services of Corporate Agents, Inc., for his continued work on an anti-aging project.[32] The trustee suggests that this followed Dr. Holzgang's solicitation of Gary's investment of 500,000 Swiss francs in Omnimedica.[33] Gary testified that CellularRx made one R&D contribution in the amount of $5,000 to Novelpharm.[34] Gary directed Patrick Higgins, whom he identified as the president of the company, to obtain the

---

[32] Exhibit 954.

[33] Exhibit 126. *See also* e-mails from Hans Holzgang to Gary, Exhibits 929, 930, 931.

[34] Gary denies that Brayford Investments, Urs Kaelin, Urs Trepp or Overseas Trust Company contributed to this funding.

EIN for Cellular Rx from the IRS.[35]  Gary holds 40,000 shares of common stock in CellularRx with

an additional 600,000-800,000 shares held by other investors.[36]  Gary is the Vice-President and a

member of the board of directors with Patrick Higgins and Windsor Savery.  CellularRx's business

purpose is to market a nutritional supplement with the brand name Cell Pro 7 containing the active

ingredient $OM_{24}$.[37]  Under an oral employment agreement with CellularRx commencing in June or

July 2007, Gary was to be paid an annual salary of $60,000 (payable bi-weekly) from available cash

flow.[38]  He received two months salary in 2007 and none in 2008.  Gary is to develop marketing for

Cell Pro 7 and solicit capital for CellularRx.[39]

Gary also started working on anti-aging projects with Win Savery in April of 2005.[40]  Gary

appears to have been involved with Novelpharm $OM_{24}$ products through the Savery Group in the

December 2006 time-frame.  Although Gary testified no agreements were ever executed, Exhibit

926  is a draft of a development agreement between Novelpharm and the Savery Group, and Gary

is identified as a member of the Savery Group.   Gary denied that Urs Trepp or Overseas Trust

Company have funded any R&D of the anti-aging projects or $OM_{24}$ product development.

2.    Other Foreign/Offshore Connections

---

[35]  Exhibit 956, 957.

[36]  Gary denies that Urs Trepp, Overseas Trust Company, Urs Kaelin, or Esther Iseppi have invested in, or made loans to, CellularRx.

[37]  Dkt. 612.  An overview and summary of CellularRx prepared by Gary was introduced into evidence. *See* Exhibit 964.  In that summary, Gary represents that CellularRx has obtained exclusive marketing rights to sell and distribute $OM_{24}$ products in North America.

[38]  Dkt. 622.

[39]  Dkt. 612.

[40]  Gary had collaborated with Savery on his enhanced oil recovery projects in the 1980's that ultimately led to disallowance of partnership deductions and Gary's tax troubles.

-11-

The trustee introduced into evidence Exhibit 903, which purports to be an undated letter to Gary from his father. In that letter, Gary's father describes Gary's finances and references $3,000 in Swiss Credit Bank. Gary's father died in 1990. Gary asserted the Fifth Amendment privilege as to all questions concerning the content of the letter, including the time frame of the letter, the name on the referenced Swiss Credit Bank account, the highest balance in the account, whether the account has been closed, and what bank held the account.

The trustee then asked Gary a series of general questions regarding offshore holdings. Gary asserted the privilege to all of these questions, including: (1) what other offshore assets he owned; (2) what accounts he had offshore; (3) what accounts FIMCO (owned by Krause Irrevocable Trust, Gary's nominee) had offshore; (4) what accounts Federal Gasohol (owned by Gary E. Krause Trust, Gary's nominee) had offshore; (5) what accounts CAPCO had offshore; (6) what accounts COSCO had offshore; (7) what accounts the family trusts had offshore; (8) what accounts Teresa Briggs (Gary's ex-wife) had offshore; (9) what offshore stocks Gary or his nominees have owned; (10) what annuities Gary or his nominees have owned offshore; and (11) what offshore insurance policies Gary or his nominees have owned.

The trustee examined Gary regarding his associations with certain foreigners, including Swiss lawyers Urs Kaelin and Urs Trepp, who provide services in the area of trusts and asset protection. Gary declined to answer these questions on the grounds of his privilege against self-incrimination.

Notable here is the fact that Overseas Trust Company ("OTC"), a Liberian nonresident domestic entity owned by the holder of bearer certificates, was established in March of 1989 and that Mr. Trepp runs the company. OTC is the common theme in several of the transactions

involving the transfer of funds into and out of Switzerland between and among Krause nominees. The certified Articles of Incorporation of OTC state that its purpose includes "in particular to act as trustees for settlements and trusts."[41] OTC was established during a time when Krause's income tax problems had become acute and in the same time frame as his disclaimer of his father's estate, his establishment of the Krause Childrens Trusts, and his numerous transfers to Teresa Briggs. Also notable is the fact that Krause refused to answer any questions about OTC, again asserting his Fifth Amendment privilege.

The trustee attempted to further explore Gary's association with Urs Kaelin in the 1999-2000 time frame and during Gary's 2000 divorce case with Teresa Briggs. The trustee introduced Exhibits 371 and 372, documents from the file of Teresa's divorce attorney. Exhibit 371 reflects correspondence between Urs Kaelin/Brayford Investments Ltd. and Gary/Federal Gasohol regarding transfer of ETS stock and a sale by Brayford. Exhibit 909, introduced by the trustee, purports to be an unexecuted 1997 loan agreement between ETS (Enhanced Telecommunications Solutions, Inc., a New Jersey company) and Federal Gasohol wherein Federal Gasohol financed ETS's business enterprise of providing long distance telephone service to the Philippines. Part of the consideration under this loan agreement was the grant of stock in ETS to Federal Gasohol. The trustee inquired whether the Brayford referenced in Exhibit 371 was the same Brayford entity that was involved in Federal Gasohol's transactions with respect to the oil tanker MV Sillery that were elicited during previous hearings in this case. The trustee also inquired whether ETS referenced in Exhibit 909 is the same ETS referenced in Exhibit 371, whether ETS transferred stock to Federal Gasohol, and whether Federal Gasohol, in turn, transferred the ETS stock to Brayford. Gary declined to answer

_____

[41] Ex. 906 and 907.

-13-

any of the questions concerning Brayford, ETS, Exhibit 371 and Exhibit 909. In Exhibit 372, Teresa Briggs' divorce attorney gave notice and sent a copy of the divorce petition and temporary order containing restraint provisions on various accounts to Urs Kaelin. Gary declined to answer what accounts Urs Kaelin would have controlled in May of 2000, when the letter was sent. Gary invoked the Fifth Amendment to the entire line of questioning regarding these exhibits and their content.

Gary declined to answer questions regarding Wegelin & Co, a private banking firm in Switzerland and whether Wegelin managed any of Gary's accounts or assets. He also declined to answer any questions regarding the Antara Foundation, which records show also wired from Switzerland, approximately $275,000 to Live Wire (apparently for the benefit of FIMCO) in late 2004.[42] The wire transfer report shows Live Wire as the beneficiary of the transfer and FIMCO (Gary's nominee), is identified under both "Originator to Beneficiary Info" and "Remittance Information."[43] The bank statement showing this transaction identified Live Wire Media Partners LLC as the account name and it was addressed to Gary's residential address.[44]

The trustee's examination of Gary concluded with Gary testifying that he personally had no offshore accounts on the hearing date and neither did the companies and trusts that had been adjudged to be Gary's nominees. Gary also testified that he had no offshore accounts or interests at the time he filed his bankruptcy case in October 2005, through the present. However, when asked if it was true that he never has had offshore accounts, Gary invoked the Fifth Amendment privilege.

> B.  Landmark National Bank Safe Deposit Boxes and Contents

---

[42] *See* Ex. 913, 914, 915.

[43] Ex. 914.

[44] Ex. 913.

-14-

When the United States filed this adversary proceeding, it sought, among other things, a temporary restraining order that restrained Gary and his brother, Richard, from spending or depleting the assets of certain trusts including Krause Children's Trusts 1 through 5 ("KCTs) and the Gary E. Krause Trust ("GEKT") without permission of the Court, pending a determination of the nominee claims.[45]  The Court entered that order *ex parte* on November 21, 2005 and, after an evidentiary hearing, entered a preliminary injunction on December 2, 2005.[46]  The text of the preliminary injunction order incorporated by reference the terms of the TRO, which stated:

> [D]ebtor-defendant Gary Krause ("debtor") and defendant Richard Krause ("defendant") are PROHIBITED from: (1) transferring any cash, property, or assets any kind [sic] from or to, or other otherwise spending or depleting assets of certain sham trusts, known as the Krause Children's Trust No. I, II, III, IV, or V ("the Krause Children's Trusts) and Gary Krause Trust, with permission of the Court; * * * [47]

The TRO also froze the assets in several bank accounts nominally owned by the KCTs, including those at UMB National Bank of America, now known as Landmark National Bank.  These terms have remained in place throughout the ensuing three years leading up to the instant trustee motion and hearing.

Notwithstanding the entry of this order, on December 16, 2005, Richard had Gary's name removed from the account title and signature cards of two safe deposit boxes at what is now Landmark National Bank and, according to the access records of that institution, Richard accessed each of the three boxes that had previously been titled in the KCTs and Gary or Gary and Richard.[48]

---

[45]  Richard was the named trustee of the KCTs and the GEKT.

[46]  Dkt. 6 and 12.

[47]  Dkt. 6.

[48]  Ex. 901.

-15-

These boxes had been established some time prior to January 1, 2002 and as of that date, were held as follows:

Box 861                    Richard or Gary/ Krause Children's Trust

Box 862                    Krause Children's Trust (Richard and Gary authorized signatures)

Box 863                    Richard or Gary/Krause Children's Trust

According to the uncontroverted testimony of Susan Stricker, an officer of Landmark National Bank, on December 16, 2005, Richard executed new signature cards for boxes 861 and 863, removing Gary's name from both. In addition, the Bank's access records show that Richard opened each of the boxes on that date. When asked to explain his actions at the initial October 9, 2008 hearing on this motion, Richard conceded that the boxes had been titled in himself, Gary, and the Krause Children's Trust on Gary's bankruptcy petition date. He also admitted entering the boxes on the December 2005 date, but said he did so only to ascertain "what I had" as trustee of the Krause Children's Trust.

At the December 2, 2008 hearing, Richard invoked his Fifth Amendment privilege against self-incrimination when asked to explain his actions on December 16, 2005. He also invoked the privilege when asked if he had removed anything from the boxes at that time and if Gary had directed him to take the actions he did. Gary similarly invoked the privilege when asked these questions.

On April 14, 2006, this Court ordered both Richard and Gary to make fully detailed disclosures of all of the assets of the KCTs.[49] Gary and Richard filed their respective disclosure statements on May 11 and 12, 2006.[50] Neither disclosed the existence of any safe deposit boxes in

---

[49] Dkt. 80, p. 28.

[50] Dkt. 98 and Dkt. 100.

the name of the KCTs.[51]

In March of 2007, this Court conducted an evidentiary hearing on Gary's alleged spoliation of computer evidence during discovery in this adversary proceeding and, on June 4, 2007, entered its order concluding that, in fact, Gary had despoiled evidence. As a part of the sanctions entered by the Court, default judgments were entered finding that all of the Gary Krause entities, except the KCTs, were Gary's nominees and, therefore, assets held by those entities were property of his bankruptcy estate subject to the IRS's federal tax liens and subject to turnover. On August 23, 2007, on the interveners Drake and Rick Krause's (Gary's sons and the nominal beneficiaries of the KCTs) motion for emergency hearing on their motion to stay enforcement of the sanctions order pending appeal, this Court temporarily stayed execution of those sanctions.[52] During this temporary stay, on August 27, 2007, Richard again changed the account titles and ownership names on boxes 861, 862, and 863 from Krause Children's Trust to "Richard D. Krause or Drake Krause or Rick Krause."[53] As yet, these boxes had not been disclosed to anyone and the Trustee did not discover them until she attempted to execute on other Krause assets at the Bank in September of 2008. Richard refused to explain his August 27 actions when he again invoked the Fifth Amendment privilege at the December 2, 2008 hearing.

For many years, Gary, Richard, and Rita Krause shared safe deposit box 754, titled in "Gary, Richard and Rita Krause." Rita is Richard's spouse. According to Landmark's records, Richard

---

[51] The omission of the safe deposit boxes is noteworthy given the disclosure of a certificate of deposit held by the KCT 3 at UMB National Bank of America.

[52] Dkt. 393. *See also,* Dkt. 380 (Interveners' Stay Motion).

[53] Ex. 901. Two days later on August 29, 2007, the Court denied the interveners motion to stay enforcement of the sanctions order pending appeal. *See* Dkt. 402.

Case 05-17429    Doc# 223    Filed 01/30/09    Page 17 of 41

accessed Box 754 on May 17, 2006, well after the entry of the TRO. On July 7, 2006, he changed the title on this box to "Richard D. Krause, Krause Children's Trust." He accessed Box 754 again on March 12, 2007. The Court notes that the May 17 entry came on the heels of this Court's April 14, 2006 order that both Krauses make a full disclosure of their assets[54] and one week after they made the actual disclosures. In that order, the Court directed as follows:

> Gary and Richard will make a complete, sworn disclosure of each and every asset owned or controlled by the KCT I, II, III, IV and IV, the Krause Family Trusts, and the GKT and any other related or affiliated entity within 15 days of this Order. The disclosure will be made to the Government and Trustee, as well as filed with the Court.

> Richard and Gary will make a complete, sworn disclosure of all assets of any entity with which Gary or Richard have a connection of any kind as promptly as possible and shall, in any event, not obstruct or delay any effort by either the government or the Trustee to investigate Gary's or the KCTs' affairs.[55]

In a footnote, the Court elaborated that the "disclosure shall include, but not be limited to, Federal Gasohol Corporation(FGC), Financial Investment Management Corporation (FIMCO), Drake Enterprises, Inc.(DEI), PHR, LLC (PHR), Polo Executive Rentals, Krause Family Trust and Krause Children Trusts I, II, III, IV and V."[56]

The Court also notes that Richard Krause's May 12 response to this asset disclosure order, filed with his counsel's assistance, declared that two of the trusts owned gold coins which he listed at cost, but did not disclose any ownership or interest in a safe deposit box held by any of the KCTs. The coins were described as "Gold Coins, Cost" and not by weight or quantity. According to the

---

[54] On May 11, 2006, the Court granted an extension of the asset disclosure deadline to May 18, 2006. *See* Dkt. 106.

[55] Dkt. 80, pp. 28-29.

[56] Dkt. 80, p. 29 n. 54.

-18-

disclosure, KCT I held $70,106.20 in gold coins at cost and KCT II held $19,317 in gold coins at cost.[57]  On May 24, Richard Krause made a sworn disclosure of his personal assets that included under the heading of Home Furnishings/Miscellaneous "Gold and Silver Coins inherited in 1990" estimated as 4000 silver dollars and 150 gold coins, "value unknown."[58]  This disclosure did not contain any reference to a safe deposit box of any kind, either, and suggested that Richard maintained this coin collection at his home.  Richard disclosed a $10,000 certificate of deposit and two checking accounts that he maintained at Landmark Bank, but no safe deposit box.  It is difficult not to conclude that Richard was motivated, at least in part, to change the title of the box by the looming disclosure deadline.  It is also clear that Richard's May 12 disclosure is incomplete because it omitted any reference to any of the safe deposit boxes.[59]

The nondisclosure of the Landmark safe deposit boxes is particularly disturbing to the Court here because this is not the first instance that Gary and Richard omitted this type of asset.  Following the June 15, 2006 hearing on the adequacy of the Krause asset disclosures, the Court found that Gary and Richard had failed to disclose a safe deposit box held by Drake Enterprises (one of Gary's adjudged nominees) at Southwest National Bank.[60]  Even though this omission was brought to

---

[57]  Dkt. 100.  Gary's disclosure of the gold coins was identical.  *See* Dkt. 98.

[58]  Dkt. 108.

[59]  This Court doubts that these disclosures conform with the sprit or the letter of the disclosure orders.  In order to determine the quantity of the coins held in "trust," the Trustee would have had to know when they were purchased, their denominations, and the price of gold on the purchase date(s).  Gary Krause suggests that this information could have been gleaned from checks obtained in the course of discovery, requiring the Trustee (and the Court) to delve into hundreds of pages of exhibits to retrace the path of these funds.  This is yet more evidence of his intransigence in the face of this Court's authority.

[60]  Dkt. 128, p. 9.  Gary did not voluntarily turn over this safe deposit box after Drake Enterprises was adjudged Gary's nominee in the June 4, 2007 sanctions order.  In October, 2008 the Court ordered turnover of the box and its contents and entered an order in the main case authorizing the Trustee to drill the box. No. 05-17429, Dkt. 207.  The contents of the Drake Enterprises safe deposit box are unknown to the Court.

-19-

Gary's and Richard's attention, and they acknowledged the omission, they made no effort to supplement their May asset disclosures to disclose the existence and contents of the safe deposit boxes at Landmark Bank. In short, the omission of the Landmark boxes cannot be chalked up to inadvertence on the part of Gary and Richard, particularly when the title changes were occurring at the very times the adequacy of the May asset disclosures were being challenged and the omission of the Drake Enterprises box was brought to their attention.

The Bank's records reflect that Richard accessed Box 754 again on March 12, 2007. Notably, this was only ten days before the evidentiary hearing on the Trustee's Motion for Sanctions for Gary's alleged spoliation of electronic evidence.[61] Also set at that time was the Government's Motion for Default Judgment and Contempt.[62]

When Richard was asked about these title modifications on Box 754, he invoked his Fifth Amendment privilege. He likewise invoked the privilege to any question of what he may have removed from the boxes. This matters because, in the initial hearing on these contempt proceedings, and before Richard sought counsel, Richard testified that in the 1990's he thought it necessary to divide up the coins contained in the various boxes. This was because the Krause children had, after Gary waived his inheritance, inherited Gary's share of his father's coin collection and Richard wanted to be sure that trust property was maintained separately from their inherited property. At the initial hearing, Richard described his entries into the boxes as being done for the purpose of "rounding up the coins" which he felt was his duty as trustee of the KCTs. He stated that he had never made an inventory of the contents of any of the boxes.

---

[61] Dkt. 219 and 220. Trial on the spoliation charge was scheduled for March 22, 2007.

[62] Dkt. 235.

Case 05-17429    Doc# 223    Filed 01/30/09    Page 20 of 41

At the December 2, 2008 hearing, Richard claimed the privilege when asked about the following: whether he had removed any gold coins from Box 754, whether he had accessed the boxes, and whether he had ever made an inventory of their contents. He claimed the privilege in responding to questions concerning the whereabouts of any of the coins, whether any had been sold or transferred, and whether any gold was removed from Boxes 861, 862, and 863 prior to September 8, 2008, the date the trustee caused the Bank to open the boxes.

At the initial hearing, Gary testified that he had accessed these boxes directly or through Richard. He suggested that his and Richard's May 2006 disclosures of the gold coins were indeed accurate because the cost of the coins could be tracked by looking at checks written to purchase them on other accounts owned by the KCTs. He stated that he had bought other gold in the past, but that he did not know its whereabouts today. Like Richard, Gary was far less forthcoming at the December 2 hearing. He claimed the Fifth Amendment privilege as to any matters relating to the coins or the boxes.

III.  Analysis

    A.    Burden of Proof for Turnover and Contempt

        1.    Turnover

There is some question as to the standard of proof required in a turnover action. It is clear that the trustee has the burden to prove that the property at issue is property of the bankruptcy estate and that the debtor has possession, custody or control of the property. Once the trustee makes a prima facie case, the burden shifts to the debtor to produce evidence disputing the trustee's prima

Case 05-17429    Doc# 223    Filed 01/30/09    Page 21 of 41

facie case.[63] State law determines the debtor's respective rights or interests in the subject property.[64]

What is not so clear is the quality of the proof that is required. One Tenth Circuit case, *In re Amdura Corp.*, states that the quality of proof necessary in a turnover proceeding is clear and convincing.[65] This statement very likely stems from United States Supreme Court authority found in *Maggio v. Zeitz,* a Bankruptcy Act case. Prior to the enactment of the Bankruptcy Code in 1978, turnover was a creature of "judicial innovation," and not expressly provided for by statute:

> In applying these grants of power, courts of bankruptcy have fashioned the summary turnover procedure as one necessary to accomplish their function of administration. It enables the court summarily to retrieve concealed and diverted assets or secreted books of account the withholding of which, pending the outcome of plenary suits, would intolerably obstruct and delay administration. When supported by 'clear and convincing evidence,' the turnover order has been sustained as an appropriate and necessary step in enforcing the Bankruptcy Act.[66]

There is no mention in the *Amdura* opinion of the Supreme Court's statement in *Grogan v. Garner* that a preponderance of the evidence standard is presumptively applied in bankruptcy proceedings, like other civil matters, because that standard "results in a roughly equal allocation of the risk of error between litigants."[67] There the Supreme Court stated that unless "particularly important individual interests or rights are at stake," the movant in a civil proceeding should not be

---

[63] *In re Rubesh,* 2006 WL 1867678 at *3, 347 B.R. 115 [Table] (10th Cir. BAP 2006); ; *In re McDonald*, 353 B.R. 287, 290 (Bankr. D. Kan. 2006); *In re Spencer,* 362 B.R. 489, 490 (Bankr. D. Kan. 2006).

[64] *Spencer, supra* at 491 n. 5, *citing Butner v. United States,* 440 U.S. 48, 54-55, 99 S.Ct. 914, 59 L.Ed. 2d 136 (1979).

[65] *Amdura Nat'l Distrib. Co. v. Amdura Corp., Inc. (In re Amdura Corp.),* 75 F.3d 1447, 1451 (10th Cir. 1996) (applying the clear and convincing standard of proof to determine if the property in question is property of the bankruptcy estate).

[66] *Maggio v. Zeitz (In re Luma Camera Serv., Inc.),* 333 U.S. 56, 62-63, 68 S.Ct. 401, 405, 92 L.Ed. 476 (1948).

[67] *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (Creditors sought to have debt declared nondischargeable for fraud under § 523(a)(2); statute did not prescribe the appropriate standard of proof.).

required to bear a standard of proof higher than a preponderance of the evidence standard.[68]

Observing that a debtor has no fundamental right to a discharge in bankruptcy, the Supreme Court

concluded that a heightened standard of proof was not required in debt nondischargeability cases,

including nondischargeability based upon fraud.[69]  This Court concludes that a clear and convincing

standard is even less compelling in a bankruptcy turnover proceeding, given a debtor's statutory

duty to cooperate with the trustee and surrender to the trustee property of the estate.[70]  In addition,

this Court concurs with *Grogan's* assessment that a clear and convincing standard of proof is

unnecessary to effectuate the "fresh start" policy.[71]  As noted there, the fresh start afforded debtors

is limited to the honest but unfortunate debtors; Congress has seen to it in the Bankruptcy Code to

condition a fresh start on the debtor fulfilling his duties under the Code and cooperating with the

trustee.

This Court is not alone in concluding that a preponderance standard applies in turnover

proceedings.  Judge Russell's evidentiary manual lists a number of cases in which the preponderance

standard was applied to turnover proceedings under §§ 542 and 543.[72]  Finally, *In re Santaella*, a

case very much like this one, contains a persuasive analysis that convinces this Court that, in the

wake of *Grogan*, a preponderance of the evidence is the appropriate standard of proof in turnover

---

[68]  *Id.* (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389-90, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)).

[69]  *Id.*

[70]  11 U.S.C. § 521(a)(3) and (4)

[71]  498 U.S. at 286-87.

[72]  Hon. Barry Russell, BANKRUPTCY EVID. MANUAL § 301.64 (Thomson/West 2007-08 ed.).

-23-

proceedings.[73]  Accordingly, the Court will apply a preponderance standard to the Trustee's turnover motions and the evidence before it.

2.     Contempt

Tenth Circuit authority is clear that bankruptcy courts have civil contempt powers under 11 U.S.C. § 105(a).[74]  A plaintiff must prove liability in a civil contempt proceeding by clear and convincing evidence.[75]  The elements to be proven in a civil contempt case are: (1) a valid court order existed; (2) defendant had knowledge of the order; and (3) the defendant disobeyed the order.[76]  The inability to comply with the order is a defense to contempt.[77]  Civil contempt sanctions, or those penalties designed to compel future compliance with court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and opportunity to be heard; neither jury trial nor proof beyond a reasonable doubt is required.  A contempt sanction is considered civil if it is remedial, and for the benefit of complainant.  A contempt fine is civil if it coerces defendant into compliance with court's order or compensates the complainant for losses sustained.  If the fine imposed is not compensatory, it is civil

---

[73]  298 B.R. 793, 799-800 (Bankr. S.D. Fla. 2002).

[74]  *Mountain America Credit Union v. Skinner (In re Skinner),* 917 F.2d 444, 447 (10th Cir. 1990).

[75]  *Reliance Ins. Co. v. Mast Constr. Co.,* 159 F.3d 1311, 1315 (10th Cir. 1998) (civil contempt proceeding for alleged violation of temporary restraining orders).

[76]  *F.T.C. v. Kuykendall,* 371 F.3d 745 (10th Cir. 2004) (civil contempt proceeding involving violation of permanent injunction, citing *Reliance, supra).*

[77]  *Reliance, supra* at 1317 (Defendant must show by clear and convincing evidence that he was unable to meet the requirements of the injunction, citing *Donovan v. Burgett Greenhouses, Inc.,* 759 F.2d 1483, 1486 (10th Cir. 1985).).

-24-

only if the contemnor has opportunity to purge.[78]

        B.     The Assertion of the Fifth Amendment Privilege and Consequences

This Court must also consider the ramifications, if any, of Gary and Richard asserting the Fifth Amendment privilege against self-incrimination at the December 2 hearing. The United States Supreme Court held in *Baxter v. Palmigiano*[79] that a court *may* draw an adverse inference against a party in a *civil* case when the party refuses to testify and invokes the Fifth Amendment. The Supreme Court stated:

> Our conclusion is consistent with the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment "does not preclude the inference where the privilege is claimed by a party to a Civil cause." [citing Wigmore on Evidence].[80]

The *Baxter* adverse inference rule was applied in the context of a bankruptcy case in *In re Moses*.[81] *Moses* is instructive on a number of fronts. There, a creditor moved to dismiss debtor's chapter 7 case for debtor's failure to disclose estate assets. The district court held that where debtor's valid assertion of the Fifth Amendment privilege precluded fair and effective administration of the estate, the case could be dismissed for cause under § 707(a). Debtor's refusal to provide

---

[78] *International Union United Mine Workers of America v. Bagwell,* 512 U.S. 821 (1994). *See also, In re Lucre Management Group, LLC,* 365 F.3d 874 (10th Cir. 2004) (debtor held in civil contempt for violating bankruptcy court order requiring debtor to use condominium rents to pay expenses of the property and prohibiting use of the rents to pay administrative costs of the bankruptcy); *In re Armstrong*, 304 B.R. 432 (10th Cir. BAP 2004) (distinguishing civil and criminal contempt sanctions).

[79] 425 U.S. 308, 96 S. Ct. 1551, 47 L.Ed. 2d 810 (1976).

[80] *Id.* at 318.

[81] 792 F. Supp. 529 (E.D. Mich. 1992).

information rendered trustee unable to administer estate.[82] The court held that the Fifth Amendment affords no absolute bar to dismissal.

> Although the Fifth Amendment privilege may validly be asserted to shield a debtor from incriminating himself through testimony, courts have generally not permitted those asserting it to benefit by denying, in civil actions, opposing parties their statutory rights. Several cases indicate that reliance on the privilege is insufficient to defend against a dismissal when the withheld information prevents the trustee from administering the estate.[83]

The *Moses* court recognized the validity of the *Baxter* negative inference rule.

> . . . the courts have never held that a Fifth Amendment claimant in a civil proceeding must be shielded from all possible negative consequences that may attend his invocation of the privilege. In fact, civil claimants have been denied certain benefits and exposed to negative consequences as a result of having invoked the privilege. . . . In a typical case, a court will permit a negative inference to attend the civil litigant's invocation of the privilege or will impose a discovery or evidentiary limitation on the claimant. . . . under *Baxter* and its progeny, a court is permitted to impose a cost on a civil defendant who chooses to remain silent by invoking his Fifth Amendment privilege.[84]

With these legal standards in mind, the Court considers the evidence presented at the December 2 hearing, as well as its findings made in prior evidentiary hearings in this adversary or the main case as they pertain to asset disclosures and offshore activity.

### C.    Offshore Holdings

---

[82] *See also Scarfia v. Holiday Bank,* 129 B.R. 671, 675 (M.D. Fla. 1990) (Bankruptcy court can dismiss, *sua sponte,* a petition that cannot be administered due to a debtor's refusal to provide information.).

[83] *Moses,* 792 F. Supp. at 533. *See also, In re Connelly,* 59 B.R. 421, 447-48 (Bankr. N.D. Ill. 1986) ("*Congress certainly did not intend assertion of the Fifth Amendment to paralyze the bankruptcy court. When a court cannot grant relief on a bankruptcy petition, it should be able to dispose of the case.* * * * Indeed, it would work a fraud on this court, on the entire bankruptcy system, and on Connelly's creditors to permit him to withhold information and documents, obtain his discharge, and walk off with most or all of his unsurrendered property. *A debtor may not turn the shield of the Fifth Amendment into a sword to cut his way to a discharge while carrying his property with him.*").

[84] *Moses,* 792 F. Supp. at 537-38. *See also, United States v. Rylander*, 460 U.S. 752, 103 S. Ct. 1548, 75 L.Ed. 2d 521 (1983).

-26-

Throughout the pendency of Gary's bankruptcy case, the Trustee and the Government have repeatedly claimed that Gary formerly had and presently has accounts or assets off-shore. Indeed, this Court has previously stated that it is likely that these off-shore assets exist. The Trustee requests that Gary be ordered to turnover any off-shore assets that he owns or controls. She also asserts that by virtue of Gary's failure to disclose these off-shore assets in response to this Court's various disclosure orders, he should be held in contempt and imprisoned until he has purged himself by making a full disclosure.

As noted previously, in order for the Trustee to prevail on her turnover claim, she must have shown at trial, by a preponderance of the evidence, that the off-shore assets are property of the bankruptcy estate and that Gary has possession, custody, or control of such assets.[85] For the contempt claim, she must have demonstrated at trial, by clear and convincing evidence, that an order to disclose the off-shore assets existed, that Gary knew of the order to disclose, and that Gary failed to disclose off-shore assets that he in fact possesses or controls.[86]

The Court is faced with a body of evidence on this point that is of varying quality. As noted in the factual background of this opinion, Gary asserted the Fifth Amendment privilege when asked whether he held foreign assets or accounts during the time prior to the date of his bankruptcy petition. He freely testified, however, that he had no such off-shore assets or accounts at present. He also freely testified that he had no such accounts or assets at the time of his bankruptcy filing or anytime after. At the same time, the Court has received evidence in this hearing, as well as in previous hearings, that Gary is able to control or direct the transmission of funds to and from

---

[85] *See* pp. 21-24, *supra.*

[86] *See* pp. 24-25, *supra.*

-27-

Overseas Trust Company ("OTC"), a Liberian entity, through Swiss banks, for his or his nominees' benefit. Gary invoked the privilege with respect to those transactions on December 2, 2008, but he has testified about them in the past. Several of these transactions provoke the Court's suspicion.

The Live Wire transaction involved FIMCO assets.[87] FIMCO owned a 43% interest in Live Wire and was subsequently adjudged to be Gary's nominee.[88] In February of 2004, FIMCO arranged for OTC to loan Live Wire some $325,000, to fund FIMCO's investment in Live Wire.[89] On December 23, 2004, a transfer of $275,000 was originated by the Antara Foundation to Live Wire in the form of a wire from Wegelin and Company, a bank in St. Gallen, Switzerland to Bank of America in Overland Park, Kansas.[90] The wire transfer report indicates that FIMCO arranged or was somehow involved with this transfer which benefitted Live Wire. In December of 2004, Gary controlled the operations of FIMCO which paid all of his living expenses. In March of 2005, just seven months before this case was filed, OTC assigned Live Wire's promissory notes to FIMCO.[91] On October 6, 2005, four days before the filing, Live Wire made a further note to OTC that was subsequently marked paid. The Court has previously concluded that Gary and his friend and sometimes business partner, Andrew Peressin, cooperated to effect payment of certain post-injunction cash calls of Live Wire by FIMCO, probably through the device of OTC.[92] Gary has

---

[87] Live Wire Media Partners, LLC was established to acquire a Nevado radio station. Dkt. 314, pp. 31-32. According to Gary's asset disclosures, his nominee FIMCO has a 43% membership interest in Live Wire. Dkt. 98.

[88] Dkt. 98; Dkt. 314, p. 57.

[89] Ex. 24.

[90] Ex. 913, 914 and 915.

[91] Ex. 24.

[92] Ex. 34. *See* Spoliation/Sanctions Order, Dkt. 314, pp. 31-32.

never satisfactorily explained the Live Wire transactions and, most recently, refused to testify about it at all.

The Court has also previously concluded that FIMCO's assignment of notes from Entity, Inc., another Peressin entity, to Administrative Services Iseppi (ASI), a Swiss entity, and the subsequent payment of those notes by Peressin to ASI resulted in the transfer of assets outside the country in violation of the preliminary injunction.[93]   This finding was part of the basis for this Court's previous finding that Gary was in contempt of the injunction.

Because Gary now refuses to testify concerning his off-shore holdings pre-petition, the Court may, based on all of the evidence before it, draw the adverse inference that Gary did indeed have foreign assets before he filed bankruptcy.  Gary was well-traveled abroad and has long been involved in some way with foreign companies.  His convoluted means of repatriating funds to settle his 2000 divorce case involved entities in Panama, Liberia, and Switzerland.  Similarly, the bank traffic in 2004 and 2005 discussed above enables the Court to infer that Gary at least controlled, if not owned, funds in Swiss accounts or held by Swiss entities.  It appears that commerce between Gary's nominees and OTC went on unabated even after this bankruptcy was filed.  Thus, the Court infers and concludes that Gary had some control or ownership of off-shore assets before he filed this case.

The Court has previously spoken to Gary's lack of credibility and therefore takes his denials of foreign asset ownership at present with more than a grain of salt.   It is highly unlikely, if not incredible, that if Gary had or controlled off-shore assets before filing, he suddenly ceased to have them at his filing date or after.  This conclusion is reasonable given his continued involvement in

---

[93]  Dkt. 314, pp. 30-31, 53-55.

overseas businesses and the fact that he had (and concealed from the Court) a consulting agreement with two Swiss companies post-petition. In addition, his nominee FIMCO managed to make capital contributions to Live Wire in 2005 and 2006 through OTC, after this case was filed. Moreover, orphan e-mails recovered from his computers includes various messages from foreign individuals soliciting his investment in various off-shore undertakings. It is clear to the Court that Gary derives a means of support somehow and somewhere, and his continued involvement with Omnimedica and other Swiss entities suggests that support comes from abroad.

The Trustee has therefore made a prima facie case for turnover. Gary has, at some point in time, owned or controlled foreign assets. He has utilized OTC to transfer funds among entities that he or his nominees claim an interest. He has refused to answer any questions concerning the specifics of those transactions, so this Court may infer that, had he truthfully answered, he would have conceded ownership or control of OTC and the accounts it utilizes in Switzerland. As noted above, the Court discounts his testimony that he held or controlled no foreign assets at or since filing. With the Trustee's prima facie case being made, the burden of persuasion shifted to Gary to refute or explain that he had no ownership or control over off-shore assets. Because he invoked the Fifth Amendment to most questions concerning off-shore assets, specific transactions and entities, he has failed to do so. The Trustee should prevail on her turnover claims.

Unfortunately, the Court still has little specific, concrete information about the nature and extent of these assets. Because the Trustee's contempt claim must be proven by clear and convincing evidence, the Court is hampered in determining whether Gary violated a disclosure or turnover order and the degree and extent to which it may enforce any turnover or disclosure orders. What the Court lacks here is evidence of a foreign asset bearing Gary's or one of his nominee's

-30-

fingerprints. This distinguishes the present matter from the *Santaella* decision upon which the Trustee relies.[94] There, the bankruptcy court had concrete direct evidence that the debtor held foreign assets that he had previously concealed. Because *Santaella* is a turnover case, the standard of proof was a preponderance of the evidence. The bankruptcy court there easily concluded, based on adverse inference and positive proof, that the debtor owned foreign property and that turnover of that property was required. Here, the Court is asked to hold Gary in contempt which requires a finding, on clear and convincing evidence, that he has violated this Court's previous disclosure orders. The Court cannot conclude that the combination of adverse inference and circumstantial evidence before it on this record is clear and convincing, but it can conclude that it is more probable than not that Gary had and continues to have or control off-shore assets. In the absence of more compelling evidence of the identity of those assets, however, it is difficult to fashion a specific order requiring their turnover and impossible for the Court to determine if Gary violates that order and subjects him to imprisonment for contempt concerning their disclosure. If and when the Trustee produces evidence of even one Euro that can be directly linked to Gary or one of his adjudged nominees, this Court will not hesitate to use its power to compel him to identify and turnover his foreign assets (whether he owns them in his name, in street name, in bearer status, in trust, or through a nominee), or face incarceration. Accordingly, the Trustee's motion for an order adjudging Gary in contempt with respect to disclosure and turnover of off-shore assets must be, at this time, denied.

The Court understands the Trustee's predicament and difficulty of obtaining the extrinsic proof the Court requires, given the considerable bank secrecy laws practiced in Liberia and

---

[94] *In re Santaella*, 289 B.R. 793 (Bankr. S.D. Fla. 2002).

Switzerland. At the same time, this Court must abide by the applicable legal standard of proof to hold Gary in contempt, even though the Court continues to have substantial doubt of Gary's veracity when it comes to the existence of off-shore assets. To the extent any compelled testimony of Gary may be shrouded by his Fifth Amendment privilege, this Court should not force him to choose between his liberty and his constitutional rights. The Court remains convinced that considerable circumstantial evidence points to Gary's frequent dealings abroad, especially in Switzerland. This evidence, coupled with his refusal to testify about those dealings and his lack of credibility before this Court, leads the Court to conclude that it is more likely than not, that Gary does in fact have or control assets abroad that could be administered to answer the claims of his creditors.

Given the current posture of the case and the fact that the Trustee has been engaged for more than three years in investigating and discovering the extent of the estate she must administer, the Court must determine how best to break this stalemate. In doing so, the Court bears in mind the economy of this case and the fact that, at present, the Trustee has a finite pool of assets to call upon to finance her ongoing inquiries. The Court must balance that against the necessity of vindicating its authority over this recalcitrant debtor.

The United States, for all intents, is Gary's only creditor. It enjoys consular and treaty relationships with Switzerland and other countries that place it in a position superior to that of the Trustee to secure information, if not cooperation, from overseas governments and depositories. Recent news reports indicate that the United States is presently engaged in obtaining information about delinquent taxpayers' assets from at least one Swiss bank.[95] While Gary may have a constitutional right to refuse to testify in court concerning these off-shore assets, he has no

---

[95] "Feds Press Swiss Bank to Name U.S. Clients," *Wall Street Journal*, January 14, 2009, http://online.wsj.com/article/SB121486342353917387.html?mod=rss_Page_One.

constitutional right whatsoever to the protection of the automatic stay. Therefore, the Court deems it appropriate to lift the automatic stay to enable the United States to pursue any collection, investigation, prosecution of any action in any court it deems advisable, or exercise any other remedy it deems appropriate in connection with off-shore assets. The United States shall keep the Trustee apprised of these efforts and, to the extent that the United States recovers any assets abroad, the same shall be forwarded to the Trustee for appropriate administration. Nothing in this order shall prevent the Trustee from conducting such further collection activity as she deems fit, nor is it this Court's intention to limit in any way her administrative discretion in this case.

### D. Safe Deposit Boxes

Gary's and Richard's concealment of the safe deposit boxes is a different matter. At issue here is whether Gary and Richard: (1) violated the Asset Disclosure Order by not disclosing the safe deposit boxes and their contents in their May, 2006 disclosures; or (2) violated the TRO and preliminary injunction by gaining access to the boxes after the KCT assets were frozen, causing their titles to be changed, and transferring ownership of the boxes. The Court acted to freeze Krause entity assets on November 21, 2005[96] and further required, by its Asset Disclosure Order entered April 14, 2006,[97] that both Richard and Gary disclose what assets the various Krause entities and trusts owned or held. If the defendants were aware of these orders, and if the Court is convinced they violated the orders, a finding of contempt and the imposition of an appropriate coercive sanction is well within this Court's power and authority.[98]

---

[96] Dkt. 6, TRO issued.

[97] Dkt. 80.

[98] *See* pp. 24-25 and citations, *supra.*

-33-

There is no doubt that Richard and Gary were well-aware of these orders. They were served with the TRO.[99] They appeared with counsel in open court on December 1-2, 2005 when the preliminary injunction hearing was conducted and the Court issued its oral ruling. They sought modification of the preliminary injunction to use frozen assets to pay the trust beneficiaries' living expenses and their attorneys,[100] a request that led to the Court's Asset Disclosure Order. They responded to the Asset Disclosure Order by filing their disclosures in May of 2006. They were in court, with counsel, for the hearing on the adequacy of those asset disclosures in June of 2006.[101]

This Court has no doubt that Richard wilfully violated the TRO and preliminary injunction and later, the Asset Disclosure Order. Notwithstanding the clear import of the TRO that all of the assets and accounts of the Krause trusts remain undisturbed, Richard entered Boxes 861, 862, and 863 on December 16, 2005. He now refuses to testify about what he did on that date, but his prior testimony in this matter suggests that, at a minimum, he shuffled the contents of the boxes. He has refused to confirm or deny that he removed anything from them. Moreover, the Bank officer's testimony establishes that Richard effectuated a "transfer" of ownership of two of these boxes in December, 2005 when he removed Gary's name from the account title and signature cards. Later in August 2007, Richard again transferred the ownership and account title on Boxes 861, 862 and 863 from the Krause Children's Trust to Richard, Drake or Rick. In addition, Richard entered Box 754, then titled in "Richard D. Krause, Krause Children's Trust," several times after the TRO and after he and Gary made disclosures concerning the ownership of coins. Even after this Court froze

---

[99] Dkt. 7.

[100] Dkt. 22 and 24.

[101] It was at the June 15, 2006 hearing that Richard's and Gary's omission of the safe deposit box titled in Drake Enterprises at Southwest National Bank from their asset disclosures came to light.

-34-

these as yet undisclosed assets, Richard transferred ownership and title of Box 754 in July of 2006 from "Gary, Richard and Rita Krause" to "Richard D. Krause, Krause Children's Trust." The Court concludes that, at a minimum, changing the ownership and title on these safe deposit boxes constituted a transfer of assets in direct violation of the TRO and preliminary injunction, whether or not Richard removed their contents.

The Court likewise concludes that Richard and Gary failed to disclose these safe deposit boxes in violation of the Asset Disclosure Order. At the time they filed their asset disclosures in May, 2006, under penalty of perjury, Boxes 861, 862, and 863 were titled in Krause Children's Trust. Similarly, Gary and Richard were record owners of Box 754 at the time of their May disclosures. By July of 2006, Krause Children's Trust was the owner of Box 754. Neither the existence of safe deposit boxes at Landmark Bank (or anywhere else), nor their contents, were disclosed.

Richard's prior assertion at the October 9 hearing that these boxes belonged to the children directly and that the absence of a roman numeral on the "Krause Children's Trust" box title rendered ownership of the boxes' content legally distinct from that of the KCTs, is simply incredible. In any event, now that he has refused to testify about any of this because it might incriminate him, this Court may infer that Richard entered these boxes at Gary's instance either to remove assets from them, or to change the ownership of those assets in such a way as to obstruct the Trustee's and the Government's lawful pursuit of them.

The Court is similarly convinced that Gary orchestrated this conduct as Gary has masterminded the entire scheme of concealment that has unraveled in this case over the last three years. The Court is further convinced, and has previously found, that Richard is Gary's willing

-35-

agent in this deception. When offered an opportunity to deny his complicity regarding these safe

deposit boxes, Gary invoked the Fifth Amendment privilege against self-incrimination. This Court

draws the negative inference, amply supported by its prior findings in these adversary proceedings,

that Gary indeed directed Richard's activities with respect to the Landmark safe deposit boxes. The

Court may therefore also conclude that Gary violated the TRO and the Asset Disclosure Order by

causing Richard to access the boxes on the dates shown and to change their titles and ownership.

The Court finds that Gary and Richard are in contempt of this Court's TRO, preliminary injunction,

and Asset Disclosure Order for this conduct.[102]

This contempt may be purged by Gary and Richard by causing the titles and ownership of

these safety deposit boxes to be reinstated to their status on October 10, 2005, the date of the

petition. At that date, Boxes 861, 862, and 863 were held by Krause Children's Trust. Box 754 was

held by Richard, Gary, and Rita Krause on the petition date. Further, and in light of the fact that this

Court has previously determined that the KCTs were Gary's nominees, the contents of the Boxes

861, 862, and 863 boxes shall be turned over to the Trustee for appropriate administration. The

contents of Box 754 shall likewise be turned over. The Court is mindful that this may implicate

some property interest of Drake and Rick Krause who have now reached majority, but nevertheless

directs Gary and Richard to cause this reinstatement of the status quo ante within five (5) days of

the entry of this order. Failing their satisfying the Trustee and the Court that this has been done,

the United States Marshals Service will be ordered to apprehend and detain Gary and Richard until

such time as they have purged their contempt by completing this title reinstatement. As an

---

[102] In addition, the Court concludes that the Trustee has met her burden of proof, under either a
preponderance or clear and convincing standard, as to turnover of the safe deposit boxes and their contents. Under
either standard, the Court is firmly convinced that Gary and his nominee Krause Children's Trust owned (and
controlled) the safe deposit boxes on the date of the petition, and are therefore property of the estate.

additional sanction, Richard and Gary will be jointly and severally assessed the costs, including reasonable attorney's fees and expenses, that the Trustee incurred in investigating, preparing, and prosecuting her contempt motion with respect to the Landmark safe deposit boxes, and, as above, they will be required to pay the same within five (5) days of submission by the Trustee of a statement of her costs, attorney's fees and expenses, on pain of incarceration.

### E. Contempt of FIMCO Repayment Sanction

The Trustee also seeks a finding that Gary is in contempt of this Court's prior order that he cause his nominee FIMCO to repay the $59,710 that he caused FIMCO to transfer to Live Wire Media Partners LLC as part of a "capital call" after the TRO and preliminary injunction were entered.[103] The Court carefully scrutinized this series of transactions in its Spoliation/Sanctions Order entered on June 4, 2007.[104] Suffice it to say here, the Court concluded that Gary had caused FIMCO to make capital contributions to Live Wire through the device of OTC.[105] This was done after the Court froze FIMCO's assets and was in contempt of the preliminary injunction and TRO. This Court further concluded that FIMCO was yet another of Gary's nominees.[106] Accordingly, on June 4, 2007, the Court ordered Gary to "cause the return of $59,710 to the account of FIMCO, the amount of contributions to Live Wire Media attributed to FIMCO after the preliminary injunction

---

[103] Dkt. 567, p. 9; Dkt. 572, p. 20.

[104] Dkt. 314, pp. 31-32, 53-55. *See also,* Ex. 34, a notice of cash call sent to the Live Wire investors in September 2006 showing a history of FIMCO's contributions.

[105] *See* Ex.24, an agreement between FIMCO and OTC whereby OTC would fund FIMCO's investment in Live Wire by loaning $325,000 to Live Wire, guaranteed by FIMCO. The Live Wire note was then assigned by OTC to FIMCO. *See also,* Ex. 61, a UCC financing statement filing showing Live Wire as the debtor and OTC as one of the secured parties.

[106] Dkt. 314, p. 59.

-37-

was entered."[107]  Gary concedes that he was and is aware of this order and further admits that he has not complied with it.

Gary argues that he lacks sufficient funds or property to repay the $59,710 to the estate.  For this defense, he bears the burden of proving by clear and convincing evidence, his inability to comply.[108]  He has benefitted from post-petition consulting agreements with Omnimedica and/or Novelpharm.  He received $8,000 a month and no less than $72,000 over a ten-month period, *all* of which was received after the Court ordered the repayment.[109]  The Court remains highly skeptical of Gary's continued poverty claims when it appears that he maintains a home and continues to work in several business ventures.  Gary has never sought relief from the repayment order (other than to appeal the judgment in which it was incorporated) and his application for a stay pending appeal was denied.  In short, there is no legal basis upon which he can continue to refuse to pay.  It further appears that Gary has access to money; he reports a number of personal loans from friends and business associates and he has employed counsel.  Therefore, the Court concludes that Gary has not proven his inability to comply with the repayment order by clear and convincing evidence.

The Court therefore finds that Gary is in contempt by failing to obey the prior Spoliation/Sanctions Order requiring him to reimburse the estate for the funds injected by FIMCO into Live Wire after FIMCO's assets were frozen.  He shall, therefore, remit to the Trustee the sum of $59,710 plus interest at the legal rate accruing from and after June 4, 2007, the date of the Spoliation/Sanctions Order, until paid.  This payment is to be made not later than ten (10) days from

---

[107]  Dkt. 314 at p. 58.

[108]  *See Reliance,* 159 F.3d at 1317.

[109]  *See* pp. 9-10, *supra.*

the entry of this order. If he fails to pay, Gary shall be apprehended and remanded to the custody of the United States Marshals Service until such time as he does remit the money.

### IV.  Conclusion

As explained more fully above, the Court finds that the Trustee's motion for turnover and contempt concerning offshore assets should be GRANTED IN PART AND DENIED IN PART; the Trustee's motion for turnover and contempt concerning the Landmark Bank safe deposit boxes is GRANTED; and the Trustee's request for an order finding Gary in contempt of the Spoliation/Sanctions Order entered June 4, 2007 ordering him to repay to the estate the sum of $59,710 transferred to Live Wire for the benefit of FIMCO is also GRANTED.

IT IS FURTHER ORDERED:

A.      With respect to any offshore assets, accounts or funds owned or controlled by Gary or his nominees as of and after October 10, 2005, Gary shall make a full and complete disclosure of such offshore assets under penalty of perjury, identifying each asset with particularity, giving its current value, location and source, and shall further turnover to the Trustee any and all such offshore assets owned or controlled. Gary shall make such disclosures and turnover any and all offshore assets within ten (10) days of the entry of this Order.

B.      The Court *sua sponte* lifts the automatic stay and authorizes the United States to pursue any collection, investigation, prosecution of any action in any court it deems advisable, or exercise any other remedy it deems appropriate in connection with off-shore assets. The United States shall keep the Trustee apprised of these efforts and, to the extent that the United States recovers any assets abroad, the same shall be

forwarded to the Trustee for appropriate administration.

C.     With respect to the Landmark Bank safe deposit boxes, defendants Gary and Richard Krause shall restore title and ownership of safe deposit boxes 861, 862, 863 and 754 as it existed on October 10, 2005.  They shall further turnover to the Trustee for administration, the contents of safe deposit boxes titled in the Krause Children's Trust (Nos. 861, 862, and 863) and of Box 745 as of October 10, 2005.  Gary and Richard are ordered to restore the status quo ante and turnover box contents within five (5) days of the entry of this Order.   Should Gary and Richard fail to comply with this Order, the Court will direct the United States Marshals Service to apprehend and detain them until such time as they have purged their contempt by completing this restoration of title.  As an additional contempt sanction, costs of this proceeding are assessed against Gary and Richard, jointly and severally, including the Trustee's reasonable attorney's fees and expenses incurred in investigating, preparing and prosecuting her contempt motion with respect to the Landmark Bank safe deposit boxes.  Gary and Richard shall pay such costs within five (5) days of submission by the Trustee of a statement of her costs, attorney's fees and expenses, or face incarceration until such costs are paid.

D.     With respect to Gary's contempt of the Spoliation/Sanctions Order of June 4, 2007, ordering him to repay to the estate the sum of $59,710, the Court orders Gary to remit to the Trustee, within ten (10) days of entry of this Order, the sum of $59,710 plus interest at the legal rate accruing from and after June 4, 2007 until paid.  Should Gary fail to repay the sum due, the Court will direct that he be apprehended and

remanded to the custody of the United States Marshals Service until such time as he complies with this order.

E.    A copy of this Memorandum Opinion containing the orders of this Court shall be served upon the Landmark National Bank, Great Bend, Kansas to effectuate the Court's orders with respect to the safe deposit boxes.

# # #